**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PHILADELPHIA EAGLES LIMITED PARTNERSHIP,**<br><br>Plaintiff,<br><br>**v.**<br><br>**FACTORY MUTUAL INSURANCE COMPANY**<br>Defendant. | **CIVIL ACTION**<br><br>**NO. 21-1776** |
| **SPF OWNER LLC and PHILADELPHIA 76ERS, L.P.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**HARTFORD FIRE INSURANCE COMPANY**<br>Defendant. | **CIVIL ACTION**<br><br>**NO. 22-1333** |

## MEMORANDUM RE: DEFENDANTS' MOTIONS TO DISMISS

**Baylson, J.**                                                   **December 15, 2022**

Prior to the Covid 19 Pandemic, the Philadelphia Eagles football team purchased a $1 Billion insurance policy for coverage of certain risks relating to "physical loss or damage of property." In 2022, after suffering a large loss of revenue, which the Eagles allege was due to COVID-19, the Eagles sought payment from its insurer, Defendant Factory Mutual Insurance Company ("FM"), which denied coverage. The Eagles then instituted suit in state court, which FM removed to this Court, following which FM filed a Rule 12(b)(6) Motion to Dismiss, contending that its policy did not "cover" the Eagles' losses.

1

Similarly, the Philadelphia 76ers basketball team and SPF Owner LLC (the "76ers Plaintiffs") purchased a comparable policy, but with different coverage terms, from Defendant Hartford Fire Insurance Company ("Hartford"). After the 76ers Plaintiffs incurred losses which they allege were due to COVID-19, Hartford denied coverage. The 76ers Plaintiffs filed suit in state court. Hartford removed the case to this Court and also filed a Rule 12(b)(6) Motion, with arguments similar to those FM made in the Eagles case.

Although these are separate cases, with separate policy language, they present similar legal and procedural issues. Several status conferences have been held with counsel, at which the Court noted the various arguments presented in the Rule 12 Motions, but stated any decision on the merits would be delayed pending a Pennsylvania Supreme Court decision or a precedential Third Circuit decision issued under Pennsylvania Law on the coverage issues, which this Court would be bound to follow.

At a prior status conference, the Court allowed the parties to serve initial written discovery but stayed any obligation to respond. This legal landscape changed as of November 30, 2022, when the Superior Court of Pennsylvania issued two en banc Opinions on insurance coverage of COVID-19 losses, which are discussed in detail below.

This Court is faced with the fact that a number of judges on the Pennsylvania Superior Court have concluded that exclusionary clauses in both policies in those cases (similar but not identical to the policies at issue in the Eagles and 76ers cases) do not prevent coverage and have issued two opinions, although not binding on this Court, that are worthy of consideration and warrant this Court to wait additional time to render a decision on the pending Rule 12 Motions. However, for reasons stated below, the Court will allow limited discovery to commence.

I.   **CASE HISTORY AND SUMMARY OF THE BRIEFS**

A.   **Summary of Alleged Facts**

As alleged by the Plaintiffs, the events giving rise to this case are as follows.  Plaintiffs were required to close or restrict access to their insured properties due to the COVID-19 pandemic for several months, resulting in substantial financial loss.  Eagles' Am. Compl. ¶ 5; 76ers' Compl. (21-1333 ECF 1-1) ¶¶ 1, 10-12, 15.  Plaintiffs claim that COVID-19 viral droplets expelled from infected individuals could have been present in the air on the properties, and landed on, attached, and adhered to surfaces, thereby physically changing the airspace and surfaces of the properties.  Eagles' Am. Compl. ¶ 129; 76ers' Compl. ¶¶ 12, 14.  The properties therefore "could not fulfill [their] essential purpose and function[.]"  Eagles' Am. Compl. ¶ 27; see also 76ers' Compl. ¶¶ 12-14.

The Eagles claim they are entitled to coverage under two distinct coverages:

(1) for property loss under the "'Time Element' (business interruption) loss, and Extra Expenses resulting from the 'risks' associated with the Pandemic" and

(2) for "specified amounts incurred . . . under the "Communicable Disease Response" and "Interruption by Communicable Disease" coverages.  Eagles' Am. Compl. ¶ 7.

The 76ers' properties were insured by Hartford under four similarly-worded policies issued from October 2019 to October 2021 (all together, the "76ers' Policies").  76ers' Compl. ¶¶ 7-8.  The 76ers Plaintiffs seek coverage for their loss of business income due to the "physical loss of or physical damage to" the 76ers' properties.  Id. at ¶ 18.

Hartford denied coverage, relying on a term that excluded coverage for the presence of viruses.  Id. at ¶ 123.  FM contended that the terms of the Eagles' Policy limited coverage to the $1 million "Communicable Disease Response" (which has been paid).  Eagles' Am. Compl. ¶ 8, 9;

Hearing Transcript (21-1776 ECF 71) at 7:18-25. FM asserts there was no duty to pay for the "physical loss or damage to property and business interruption" because of an exclusion for losses caused by "contamination." Eagles' Am. Compl. ¶¶ 8, 9.

   **B.    Procedural History and Briefing of <u>Philadelphia Eagles v. Factory Mut. Ins. Co.</u>**

The Eagles assert two claims: **Declaratory Judgment** of the Eagles' rights and the obligations of FM under the contractual agreement to provide coverage for the Eagles' losses (Eagles' Am. Compl. ¶ 220) and **Declaratory Judgment** estopping FM from asserting that the Policy does not afford coverage for the Eagles' losses under the regulatory estoppel doctrine (<u>Id.</u> at ¶ 230).

FM argues that the Eagles have failed to plead facts that could establish "physical loss or damage" because there was no "tangible destruction" of any part of the property, and loss of use can only trigger coverage if it is "tied to a physical condition actually impacting the property." FM Mot. (21-1776 ECF 48) at 1, 10, 17. Second, FM argues that even if there were physical loss or damage, the Contamination Exclusion expressly excludes coverage resulting from a "virus" or a "disease causing or illness causing agent." <u>Id.</u> at 1, 21-27. Instead, coverage for Communicable Diseases is limited to $1 million in additional coverage. <u>Id.</u> at 8-9, 24-25. FM also argues that the "Loss of Use" and "Law or Ordinance" Exclusions bar the Eagles from recovering loss caused by governmental orders issued in response to the pandemic. <u>Id.</u> at 1-2, 17-19, 27-30. Last, FM argues that the estoppel claim fails because their position is consistent with prior statements about the Communicable Disease coverage, and that the Contamination Exclusion is valid despite being worded differently from other virus exclusions found in different contracts. <u>Id.</u> at 26-27, 30-32.

The Eagles responded, arguing that the Eagles' Policy coverage extends to losses resulting from the risks of direct physical loss or damage to the Eagles' property, and that "physical loss"

4

should be considered a separate term with an independent meaning from "physical damage." Eagles' Resp. (21-1776 ECF 50) at 10-11.  As such, limitations on the use of the property due to threat of contamination would trigger coverage.  Id. at 9, 11.  The Eagles argue that "imminent" threat or risk of physical impact is sufficient to show physical loss.  Id. at 3, 25, 29-33.  At a minimum, the Eagles argue that questions about the threat or prevalence of the virus at the Eagles' property and the intended meaning of the Eagles' Policy require discovery.  Id. at 12, 17.  The Eagles argue that the Contamination Exclusion conflicts with the Communicable Disease Coverage, and so must be interpreted to allow full coverage for Communicable Diseases.  Id. at 36-38.  Finally, the Eagles argue that FM is estopped from relying on the Contamination Exclusion because of prior statements made to regulators and that the Contamination Exclusion is limited to "hazardous materials."  Id.  at 42-44.

FM argues that the Eagles invent ambiguity that is not present in the policy.  FM Reply (21-1776 ECF 52) at 1.  It argues that loss of use does not constitute physical loss because the latter requires a change to some physical condition of the property.  Id. at 1-4.

### C.    Procedural History and Briefing of <u>SPF Owner and Philadelphia 76ers v. Hartford Fire Ins. Co.</u>

The 76ers Plaintiffs assert one claim: **Declaratory Judgment** that Hartford had a duty to pay for Plaintiffs' losses caused by COVID-19.  76ers Compl. ¶¶ 132-139.  Hartford filed a Motion to Dismiss, arguing that the "Virus Exclusion" bars coverage of the 76ers Plaintiffs' claims, stating that Hartford "will not pay for loss or damage caused directly or indirectly by" the "[p]resence, growth, proliferation, spread, or any activity of . . . virus."  HF Mot. (22-1333 ECF 6) at 10-11. Second, Hartford argues that the 76ers Plaintiffs fail to allege any facts that would establish "physical loss of or physical damage to" the insured property.  Id. at 17-18.  It argues that economic loss is not the same as physical damage, and that the properties were useable.  Id. at 17-22.  Last,

it argues that the 76ers Plaintiffs have not alleged facts necessary to trigger the other coverage claimed.  Id. at 24-30.

The 76ers Plaintiffs argue that Third Circuit case law supports interpreting "physical loss" to trigger when a property is no longer usable or functional.  76ers Resp. (22-1333 ECF 12) at 1, 13.  The 76ers Plaintiffs argue that physical loss exists where the property's use is reduced "to a substantial degree."  Id. at 8, 18.  The 76ers Plaintiffs also argue that the Virus Exclusion only applies to "wood diseases," not human diseases, and that it is ambiguous, regardless.  Id. at 21-23.

Hartford replied, arguing that the 76ers Plaintiffs' "wood disease" argument ignores the unambiguous meaning of the word "virus."  HF Reply (22-1333 ECF 19) at 2-4.  Hartford reemphasizes that the 76ers Plaintiffs fail to allege any direct physical loss or physical damage, and that preventative measures do not constitute damage.  Id. at 6-10.  Hartford argues that the vast weight of authority disfavors the 76ers Plaintiffs on all points.  Id. at 5, 7, 11-12.

## II.   POLICY LANGUAGE

### A.   Eagles' Policy Language

The terms of the Eagles' Policy (Eagles' Policy (21-1776 ECF 44-1)) are addressed in full below.  The Eagles' Policy is divided into five sections: Declarations, Property Damages, Time Element, Loss Adjustment and Settlement, and General Provisions.  Eagles' Policy at Table of Contents 1-3.  The first line of the Declarations section of the Eagles' Policy states that the Policy "covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as herein excluded, while located as described in this Policy."  Id. at 1 (emphasis included).  That language is not defined and is not included in the Property Damage section of the Eagles' Policy.  Under the Property Damage section of the Eagles' Policy, the Eagles' Policy excludes "indirect or remote loss or damage," "interruption of business, except to

the extent provided by this Policy" (the "Loss of Use Exclusion"), "loss or damage or deterioration arising from any delay," and "loss from enforcement of any law or ordinance" (the "Law or Ordinance Exclusion"), among other exclusions.  Id. at 10, Section 3.A.1, 2, 4, 6.  Additionally, the Eagles' Policy's Physical Damage section contains the following exclusion ("the Contamination Exclusion"):

> This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:
> 1) **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured.  This exclusion . . . does not apply to radioactive contamination which is excluded elsewhere in this Policy.

Id. at 13, Section 3.D.1 (emphasis original).  Under the General Provisions section, "contaminant" is defined as "anything that causes contamination."  Id. at 62, Section 13.  "Contamination" is defined as:

> [A]ny condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold, or mildew.

Id.  Under the "Additional Coverages" section of the Physical Damage section, the Eagles' Policy addresses coverage for "Communicable Disease Response," as follows:

> If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:
> 1) an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or
> 2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,
> this Policy covers the reasonable and necessary costs incurred by the Insured at such **location** with the actual not suspected presence of **communicable disease** for the:
> 1) cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and

7

2) actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.

This Additional Coverage will apply when access to such **location** is limited, restricted or prohibited in excess of 48 hours.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the actual not suspected presence of **communicable disease**.

Id. at 21, Section F (emphasis original). "Communicable disease" is defined under the General Provisions section as "disease which is: (A) transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or (B) Legionellosis." Id. at 62, Section 13.

The Eagles' Policy also covers Time Element loss "directly resulting from physical loss or damage of the type insured . . . to property described elsewhere in this Policy and not otherwise excluded by this policy[.]" Id. at 33, Section 1.A.1. Time Element coverage can be calculated based on either gross earnings, or gross profit. Id. at 34, Section 2. The Time Element period of liability is:

For building and equipment, the period
a) starting from the time of physical loss or damage of the type insured; and
b) ending when with due diligence and dispatch the building and equipment could be: (i) repaired or replaced; and (ii) made ready for operations, under the same or equivalent physical and operating conditions that existed prior to the damage.

Id. at 40, Section 3.A. However, the Time Element policy does not insure:

Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:
1) physical loss or damage not insured by this Policy on or off of the insured location[, or]
4) any other reason other than physical loss or damage insured under this Policy.

Id. at 43, Section 4.A. The Time Element section also contains an Interruption by Communicable Disease Additional Time Element Coverage Extension. Id. at 51-52, Section E.

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such location is limited, restricted or prohibited by:

1) an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease**.

This Extension will apply when access to such **location** is limited, restricted, or prohibited in excess of 48 hours.

INTERRUPTION BY COMMUNICABLE DISEASE Exclusions: As respects INTERRUPTION BY COMMUNICABLE DISEASE, the following additional exclusion applies:

This Policy does not insure loss resulting from:

1) the enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

Id. (emphasis original).

## B.     76ers Policies' Language

There are four related policies at issue in the 76ers' matter, but all include the same language.  For brevity, citations are only provided to the 2019 SPF Policy.  All Policies provide:

[Hartford] will pay for direct physical loss of or direct physical damage to [the Properties] caused by or resulting from a Covered Cause of Loss.

See e.g. 2019 SPF Policy, 22-1333 ECF 1-1 Dkt. at 117.  Despite that language appearing throughout the 76ers Policies and in nearly all relevant sections, the terms "physical," "loss," "physical loss," "damage," and "physical loss of or damage to" are not defined.  A Covered Cause of Loss is defined as:

[D]irect physical loss or direct physical damage that occurs during the Policy Period and in the Coverage Territory unless the loss or damage is excluded or limited in this policy.

Id. at 130.

All the coverages that the 76ers Plaintiffs seek use the same language regarding "direct physical loss" or "direct physical damage."  The relevant policy terms are:

> **Business Income and Extra Expense Coverage**. Hartford "will pay . . . for the actual loss of Business Income [76ers Plaintiffs] sustain and the actual, necessary and reasonable Extra Expense [76ers Plaintiffs] incur due to the necessary interruption of [their] business operations during the Period of Restoration due to direct physical loss of or direct physical damage to property caused by or resulting from a Covered Cause of Loss at 'Scheduled Premises' . . . ."  <u>Id.</u> at 123.

> **"Extra Expense"**: "the actual, necessary and reasonable expenses [76ers Plaintiffs] incur during the Period of Restoration that [76ers Plaintiffs] would not have incurred if there had been no direct physical loss of or direct physical damage to property caused by or resulting from a Covered Cause of Loss at 'Scheduled Premises'."  <u>Id.</u> at 123.

> **Dependent Properties Coverage**. Hartford "will pay for the actual loss of Business Income [76ers Plaintiffs] sustain and the actual, necessary and reasonable Extra Expense [76ers Plaintiffs] incur due to the necessary suspension of [their] operations during the Period of Restoration," but only if the suspension is "caused by direct physical loss of or direct physical damage to a Dependent Property caused by or resulting from a Covered Cause of Loss."  <u>Id.</u> at 110.

> **Accounts Receivable Coverage**. Hartford "will pay for direct physical loss or direct physical damage caused by or resulting from a Covered Cause of Loss to [76ers Plaintiffs'] records of Accounts Receivable," i.e., "amounts due from [76ers Plaintiffs'] customers that [76ers Plaintiffs] are unable to collect; due to a covered direct physical loss or covered direct physical damage to inscribed, printed, written or electronic records of accounts receivable," as well as interest on loans, collection expenses and other reasonable expenses.  <u>Id.</u> at 80.

The "period of restoration" begins when the Covered Cause of Loss occurs and ends when the property is "repaired, rebuilt or replaced with reasonable speed and similar quality" or "when business is resumed at a new permanent location."  <u>Id.</u> at 124 (2019 SPF Policy).

Coverages for Civil Authority and Ingress or Egress also require a showing of direct physical loss or damage.  Both coverages require, among other things, a Covered Cause of Loss.  <u>Id.</u> at 130.  Civil Authority coverage applies "when access to [76ers Plaintiffs'] 'Scheduled Premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of [the] 'Scheduled Premises'."  <u>Id.</u> at 109.  Ingress

10

or Egress coverage applies "when ingress or egress to [76ers Plaintiffs'] 'Scheduled Premises'" is

prohibited or limited as the "direct result of a Covered Cause of Loss to property at premises that

is contiguous to [the] 'Scheduled Premises'." Id. at 112, 92.

The 76ers' Policies include exclusions, including one that excludes coverage for damage

caused directly or indirectly by viruses (the "Virus Exclusion").

> [Hartford] will not pay for loss or damage caused directly or indirectly by any of
> the following.  Such loss or damage is excluded regardless of any other cause or
> event that contributes concurrently or in any sequence to the loss or damage.
> [. . .]
> **"Fungus", Wet Rot, Dry Rot, Bacteria or Virus**[:] Presence, growth,
> proliferation, spread, or any activity of "fungus," wet rot, dry rot, bacteria or virus.
> [. . .]
> [This exclusion] appl[ies] whether or not the loss event results in widespread
> damage or affects a substantial area.

Id. at 130-131, 133.

## III.    STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual

allegations as true and views them in a light most favorable to the plaintiff.  Doe v. Univ. of the

Scis., 961 F.3d 203, 208 (3d Cir. 2020).  To survive this motion, a plaintiff must include sufficient

facts in the complaint that, accepted as true, "state a claim to relief that is plausible on its face."

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A complaint is insufficient if it suggests

only the "mere possibility of misconduct" or is a "[t]hreadbare recital[ ] of the elements of a cause

of action, supported by mere conclusory statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678-79

(2009) (citing Twombly, 550 U.S. at 555).  To survive the motion, a plaintiff must "plead

'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to

draw the reasonable inference that the defendant is liable for misconduct alleged.'"  Warren Gen.

Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011) (quoting Fowler v. UPMC Shadyside, 578

F.3d 203, 210 (3d Cir.2009)).

11

IV.     **ANALYSIS OF THIRD CIRCUIT AND PENNSYLVANIA CASE LAW**

As a preliminary matter, a court must construe the language of an insurance policy "in its plain and ordinary sense," and where "the language of an insurance policy is plain and unambiguous, a court is bound by that language." Pennsylvania Nat'l Mut. Cas. Ins. Co. v. St. John, 106 A.3d 1, 14 (Pa. 2014). "Coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured," whereas exclusions are "interpreted narrowly against the insurer." Westport Ins. Corp. v. Bayer, 284 F.3d 489, 498 n.7 (3d Cir. 2002) (internal quotation omitted).

A.     **Port Authority of New York and New Jersey v. Affiliated FM Ins. Co.**

The Third Circuit has addressed the question of whether "sources unnoticeable to the naked eye" can cause physical loss or damage to a property severe enough to trigger insurance coverage for "physical loss or damage." Port Authority of New York and New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226, 235-36 (3d Cir. 2002). The Third Circuit examined whether the presence of asbestos in a building could be considered "physical loss or damage." Id. at 230. The insured argued that asbestos located in the insured property could deteriorate to the point that it could disperse into the air and lead to an increased risk to human health. Id. at 230-31. The District Court, applying New York and New Jersey law, determined that "'physical loss or damage' could be found only if an imminent threat of asbestos release existed, or actual release of asbestos resulted in contamination of the property so as to nearly eliminate or destroy its function, or render it uninhabitable. The mere presence of asbestos . . . was not enough to trigger coverage." Id. at 232.

After noting that "all risks" does not mean "every risk" (id. at 234), the Third Circuit determined "[p]hysical damage to a building as an entity by sources unnoticeable to the naked eye

must meet a higher threshold" than visual damage to trigger coverage for "physical loss or damage." Id. at 235-36.  Because the policy in question included "physical loss" as well as "physical damage," the Third Circuit ruled that large quantities of a dangerous particle could constitute a distinct loss to the owner if the quantity "is such as to make the structure uninhabitable and unusable[.]" Id. at 236.  However, if the dangerous particle is merely "present in components of a structure, but is not in such form or quantity as to make the building unusable, the owner has not suffered a loss." Id.  The Third Circuit adopted the District Court's standard that "physical loss or damage" requires "contamination of the property such that its function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable, or if there exists an imminent threat of the release of a quantity of [the substance] that would cause such loss of utility." Id.  Absent evidence of such a threat of or actual loss of function, mere presence of the substance or "the general threat of its future release it not enough . . . to trigger coverage" under a "physical loss or damage" policy. Id.

The facts addressed by the Third Circuit in Port Authority make no reference to any exclusions.

**B.   Motorists Mut. Ins. Co. v. Hardinger**

The Third Circuit later affirmed the standard of Port Authority, this time applying Pennsylvania law.  131 Fed. Appx. 823 (3d Cir. 2005).  In Motorists Mut., the Third Circuit addressed a question of whether e-coli in a house's well water, resulting in infections and respiratory, viral, and skin conditions, entitled the homeowners to coverage for physical loss or damage. Id. at 824-25.  The Third Circuit, citing Port Authority, disagreed with the lower court's decision that the e-coli contamination was merely a "constructive loss" rather than a "physical

loss." Id. at 825-827.  Instead, the Third Circuit ruled that there was a genuine issue of triable fact as to whether the property was made useless or uninhabitable.  Id. at 826-27.

The policy in question did have a "pollution" exclusion, which the insurance company claimed applied to the e-coli contamination.  Id. at 824.  The Third Circuit did not address this argument but remanded the issue for the District Court's consideration.  Id. at 825.

### C.    MacMiles, LLC d/b/a Grant St. Tavern v. Erie Ins. Exchange

The Pennsylvania Superior Court has recently determined that "physical loss or damage" requires some kind of physical alteration.  2022 Pa. Super. 203 (2022) (en banc) (slip op.) at 9-14. The lower court had granted the insured's motion for summary judgment and denied the insurer's motion for judgment on the pleadings.  Id. at 1.  The insured argued that the economic losses they suffered due to disruptions caused by COVID-19, resulting in the loss of use of their business premises, were covered under their commercial business property policy, which covered "income protection" resulting from "direct physical 'loss' of or damage to Covered Property."  Id. at 1, 5-6. The Superior Court ruled that "mere loss of use of commercial property unaccompanied by physical alteration or other condition immanent in the property that renders the property itself unusable or inhabitable" is not covered by the insurance policy.  Id. at 2.  The Pennsylvania Superior Court cited both Port Authority and Motorists Mut. in support of its ruling.  Id. at 10, 13-14.

The lower court had determined that "physical loss" and "physical damage" were two distinct terms, and so the term "physical loss" did not necessarily require physical or structural damage.  Id. at 7.  It emphasized that the social distancing orders resulted in physical limitations on the use of the property.  Id.  However, the Pennsylvania Superior Court was not convinced, observing that "[n]early all courts addressing this issue have held that economic loss

14

unaccompanied by a physical alteration to the property does not trigger coverage[.]"  Id. at 8-9. Despite a handful of cases finding for insured parties, the Superior Court noted that "the weight of authority" is in favor of insurers.  Id. at 13.

The Superior Court determined that one factor separating rulings in favor of the insured as opposed to rulings in favor of the insurer was that, where the insured were successful, they had been able to show that "the condition that caused the loss, though not a visible physical alteration to the covered property, was physically present in the covered building."  Id. at 14.  Unlike in cases like Motorists Mut., where e-coli was physically present on the premises, the plaintiffs in MacMiles were subjected only to a prohibition on in-person dining – there was no evidence that COVID-19 was actually present in the insured property, but was instead "brought in" by patrons. Id. at 15.

The Superior Court ruled that, while it is reasonable to read "physical loss" as having a distinct meaning from "physical alteration or destruction," the term "physical loss" only makes sense "in the context of partial physical damage or total destruction of the covered property," not "in the context of purely economic loss."  Id. at 15-16.  The insured had failed to allege any physical damage and had acknowledged that preparation of meals was still permitted.  Id. at 16. Thus, the building had not been rendered unusable.  Id.

The Pennsylvania Superior Court also addressed the insured's argument that their loss should be covered under the Civil Authority clause.  Id. at 17.  It again determined that the mere presence of COVID-19 at the property could not establish coverage without a showing that a property was rendered unusable or uninhabitable.  Id. at 18. The Pennsylvania Superior Court did not discuss any exclusion that could apply to viruses.  Id. at 19.

15

D.      **Ungarean v. CAN and Valley Forge Ins. Co.**

On the same day it decided <u>MacMiles</u>, the Pennsylvania Superior Court reiterated its determination that the terms "physical loss" and "physical damage" had separate meanings, but unlike its decision in <u>MacMiles</u>, it ruled that "physical loss" could include deprivation from use of the insured property.  <u>Ungarean v. CNA and Valley Forge Ins. Co.</u>, 2022 Pa. Super. 204 (2022) (en banc) (slip op.) at 11.  As in <u>MacMiles</u>, the insured alleged significant losses when COVID-19 interrupted its business and claimed that the insurer should cover the losses due to the "direct physical loss" of the insurer's dental practice.  <u>Id.</u> at 2.  The lower court had found that Ungarean was entitled to coverage under the Business Income and Extra Expense provisions, which provided coverage for suspension of operations resulting from "direct physical loss of or damage to property."  <u>Id.</u> at 6-7.

The Superior Court noted that "Ungarean's interpretation of an ambiguous contract need only be reasonable to be controlling," and that Ungarean's contention that "direct physical loss" should mean something different from "direct physical damage," was reasonable and properly adopted by the lower court.  <u>Id.</u> at 8-9.  Citing the lower court at length, the Pennsylvania Superior Court affirmed that "loss" could include "loss of use of property absent any harm to the property" or "the act of being deprived of the physical use of one's property."  <u>Id.</u> at 9-10.  It also agreed with the lower court's reasoning that COVID-19 had a close logical and consequential relationship with the way Ungarean could use his property and physical space, and so the lower court's interpretation did not write the word "physical" out of the contract.  <u>Id.</u>  at 10-11.  The insured's "loss of the use of his [property] due to COVID-19 and the governmental orders equated a direct physical loss of his property."  <u>Id.</u> at 11.  The Superior Court noted in dicta that another way the insured could show direct physical loss or damage would be to show "the actual presence of

COVID-19" such that the property became "uninhabitable or unusable." Id at 11 n.3.  However, Ungarean did not allege that COVID-19 was actually present in his property.  Id.

As Hartford (HF Mot. at 20), the insurer in Ungarean argued that the Period of Restoration clause required repairs, thereby implying some physical alteration had to occur to trigger coverage. Id. at 12.  The Superior Court agreed with the lower court's determination that Periods of Restoration are "time limits" and do not alter the definition of "physical loss or damage."  Id. Addressing a series of exclusions on which the insurer relied, including a Contamination Exclusion, the Superior Court held that that exclusion did not apply to the insured's claim, largely because it was not in the proper category that applied to Business Income and Extra Expense coverage, raising ambiguity that had to be resolved in favor of the insured.  Id. at 2, 14-18. Additionally, because Ungarean had not alleged that COVID-19 was actually present, the Contamination Exclusion did not apply.  Id. at 20.  The Superior Court ruled that the exclusion for "fungi, wet rot, dry rot, and microbes" did not mention "virus" in any definition, and so did not apply.  Id. at 14, 21.  Also, the court ruled that, because the Ordinance or Law Exclusion specifically related to structural integrity, it did not apply to the facts at issue.  Id. at 22.

Judge Stabile of the Pennsylvania Superior Court, who wrote the majority opinion in MacMiles, wrote a lengthy dissent, arguing that the Ungarean majority "endorse[d] a strained construct of the Policy[.]"  Id. at 2 (dissent, J. Stabile).  The dissent pointed to the "almost unanimous majority of jurisdictions to have addressed this issue" ruling that a policy "does not cover mere *loss of use* of commercial property unaccompanied by physical alteration or other condition in the property that renders the property itself unusable or uninhabitable."  Id. at 3 (dissent, J. Stabile) (emphasis original).  "[E]conomic loss, unaccompanied by a physical alteration to the property does not trigger coverage[,] . . . a result that is overwhelmingly and persuasively

supported by decisions from across the country." Id. at 9 (dissent, J. Stabile).  The dissent would

have applied the Third Circuit's reasoning in Port Authority and Motorists Mut. requiring that the

building be rendered "uninhabitable and unusable." Id. at 10, 13 (dissent J. Stabile).  The dissent

would have denied the insured relief because the insured did not allege that COVID-19 caused any

physical alteration to the building, but was merely limited as to the number of patients coming into

the building. Id. at 15 (dissent, J. Stabile).

V.      **CONCLUSION**

        Given the recent en banc decisions of the Pennsylvania Superior Court, some observers

may perceive inconsistencies in reaching contrary coverage decisions in the two cases discussed

above.  One distinguishing point is that, unlike the insured in MacMiles who the court determined

had not properly alleged physical damage, all Plaintiffs in the Eagles and 76ers case have alleged

physical damage to their Properties due to the presence of COVID-19 on the surfaces and in the

air of the Properties.  Eagles' Am. Compl. ¶ 5; 76ers' Compl. ¶¶ 11-12.  However, the Ungarean

decision suggests that omission is not fatal to an insured's position.  Ungarean, 2022 Pa. Super.

204 (slip op.) at 11 n.3.  The concurrence by Judge Panella in MacMiles emphasized that the

difference between the outcomes of MacMiles and Ungarean was "because these cases . . . are fact

intensive matters which require, in each case, a review of the individual policy." MacMiles, 2022

Pa. Super. 203 (slip op.) at 1 (concurrence, J. Panella).  The concurrence did not identify what

language resulted in the different outcome.

        Additionally, the Defendant Insurers took the position in state court that there were

exclusionary clauses which required ruling as a matter of law that there was no coverage for the

alleged COVID-19 damages.  Those arguments have been repeated by the insurers in these cases.

Given this Court's preference to delay decisions on this issue, as of this time, it is therefore

appropriate to allow Plaintiffs to initiate limited discovery without ruling on the Motions to Dismiss.  Although this may seem unusual, the issues raised by the parties may require discovery and because facts can be forgotten or mistaken, and human recollection is not infinite, this Court believes that it would be fair to allow the Plaintiffs to commence limited discovery to at least get some "beachhead" of facts in the possession of the Defendants that may be informative if it is eventually held, under authoritative court decision and based on Pennsylvania Law, that either of these policies have some ambiguity or that any of the other Plaintiffs' theories are allowed to proceed.  Fairness to the Plaintiffs without undue prejudice to the Defendants, warrants discovery.

Counsel have advised that a similar case is pending before the Third Circuit which may itself decide to wait for the Pennsylvania Supreme Court to make a decision.  Indeed, the Third Circuit may certify the issue to the Pennsylvania Supreme Court.  See Third Circuit Local Appellate Rule Misc. 110 and Internal Operating Procedure 10.9.  There is no certainty that the two Superior Court cases will result in any prompt decision by the Pennsylvania Supreme Court. In the first place, those cases could be settled by the parties.  Even if there is no settlement and a petition for allocator is filed, the Pennsylvania Supreme Court will first decide whether to grant allocator and then, if so, there will certainly be a period of time for briefing, presumably to be followed by oral argument – and some time can pass before the Pennsylvania Supreme Court will have rendered a definitive decision.

At the conclusion of the argument held on December 7, 2022, the Court instructed counsel to meet and confer about an initial discovery program and to submit either a joint proposal or separate proposals to this Court.  These documents have now been filed.  Eagles' Joint Status Report (21-1776 ECF 70); 76ers' Status Report (22-1333 ECF 31); H.F. Status Report (22-1333 ECF 32).

After both parties submitted proposals to initiate limited discovery, the Court has determined that at this time discovery should be limited to exchange of documents by both parties. The Eagles and FM have requested additional time.  The 76ers and Hartford have very different views of what discovery should take place.

The Court has determined that both parties must preserve documents, including Electronically Stored Information ("ESI").  A period of time will be allowed for further meet and confer.  An appropriate order follows.